UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH C. BROMLEY, JOSEPH V.
CLEMENTE, and DEAN J. CLEMENTE,
individually and as directors of National
Semi-Trailer Corp., a Michigan corporation;
RENEE SUCHARA, and individual; OMNI
VENTURES, INC., A Michigan corporation,
and CHURCHILL TRAILERS, INC.,
a Michigan corporation,

          CASE NO. 05-71798
   Plaintiffs,         HON. LAWRENCE P. ZATKOFF

v.

RANDALL BROMLEY, individually and as
Trustee of The RANDALL BROMLEY FIRST
AMENDED AND RESTATED REVOCABLE
LIVING TRUST, JOHN VERDON and SCOTT
MACKEY, individually and in their capacity as
officers and directors of National Semi-Trailer
Corp., a Michigan Corporation; JOSEPH C. BROMLEY, II
as an officer and direction of NATIONAL SEMI-TRAILER
CORP.,

   Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on September 28, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is presently before the Court upon Plaintiffs' Motion for a Preliminary Injunction. The preliminary injunction hearing was held on September 28, 2006. For the reasons set

forth below, Plaintiffs' motion will be GRANTED.

## II.  BACKGROUND

Plaintiffs filed their complaint in state court on April 1, 2005, in their individual capacities, and as directors and shareholders of National Semi-Trailer Corp ("National"). Plaintiffs all reside in Michigan and National is a Michigan corporation in the business of leasing semi-trailers for use in interstate commerce. By their Complaint, Plaintiffs have asserted claims for minority shareholder oppression, removal of directors, accounting, inspection of records, and conspiracy. In essence, Plaintiffs object to a number of expenses National has incurred on Defendants' behalf and object to the way Defendants are managing National. Defendants removed the case to federal court based on diversity of citizenship. A bench trial is scheduled for May 2007.

In their current motion, Plaintiffs seek to enjoin Defendants from taking action pursuant to a number of recent amendments to National's bylaws, which they claim Defendants could use to oppress them as minority shareholders. Among the objectionable provisions, which are covered below, are sections regarding attendance at shareholder's meetings, proxies, issuance of stock and other rights in National, directors' duties, ratification of conflicted transactions, and indemnity.

**A. Randall Bromley**

Defendant Randall Bromley, as the Trustee of the Randall Bromley First Amended and Revocable Living Trust and sole shareholder of NST Corp. III ("NST"), owns the majority of the voting stock in National, and is the central figure in this litigation. Plaintiffs allege that Randall Bromley, as the majority shareholder and as a director of National, controls the corporation and the other directors, and has used his position for his own personal gain. Plaintiffs contend that Randall Bromley has been joined in this abuse of power by the other named Defendants, and a National

employee, Rick Purvis,[1] who Randall Bromley hired as National's corporate pilot.

Essentially, Randall Bromley is National. As the controlling shareholder and CEO, he dictates corporate action. Moreover, the governing documents permit him to act unilaterally, with no checks on his power and without notice to other shareholders. For example, National's bylaws provided that they could be amended upon the affirmative vote of those shareholders holding a majority of the stock entitled to vote, i.e. Randall Bromley. Further, such action could be taken without a meeting, without prior notice, and without a vote if all of the shareholders consented, unless a lesser number is permitted by the articles of incorporation. Not surprisingly, National's articles of incorporation only required the consent of a majority of the shareholders entitled to vote, i.e. Randall Bromley, to waive the meeting, notice, and voting provisions. In other words, Randall Bromley, as the majority shareholder, was able to waive all notice, meeting and voting requirements, and amend National's bylaws as he saw fit. His position as the majority shareholder made it possible for other corporate action as well, including electing directors and entering into commercial transactions.

In 1998, National's directors approved a $300,000 base salary for Randall Bromley and certain incentives tied to corporate performance. According to corporate records, National did not meet the specified level of performance for the years 2001, 2002, and 2003. However, in May 2005, the board of directors, upon Randall Bromley's request, ratified all corporate salaries for the previous five years, which allegedly included unearned bonuses. Another of the salaries was that of Rick Purvis, the corporate pilot. Mr. Purvis had been hired by Randall Bromley, despite having

---

[1] The Court dismissed Plaintiffs' claims against Rick Purvis because the Court lacked personal jurisdiction over him.

never flown an airplane. Further, so that Mr. Purvis could fulfill his duties as the corporate pilot, National paid for his flight training and pilot's license.

Plaintiffs allege Randall Bromley engaged in numerous other abuses of his majority and control position. One area of concern for Plaintiffs involved Randall Bromley's personal use of corporate assets, including club memberships, automobiles, homes, and the corporate jet. Plaintiffs allege that Randall Bromley used corporate memberships at various country clubs and resorts for personal, rather than business purposes. Plaintiffs also questioned Defendants' trips to the Carribean using the corporate jet, specifically to locations where National did no business. Finally, National leased a corporate residence in Orlando to Randall Bromley that was previously used solely for business purposes.

Defendants' questionable conduct also allegedly extends to their other businesses. As part of its business, National operates several branch locations throughout the eastern United States. Plaintiffs allege that Randall Bromley used these locations to enter into self-interested transactions. National's lease for its Ellenwood, Georgia, branch contained an option to purchase the property for $775,000. According to an appraisal, the land was worth $910,000. National did not exercise its option to purchase the land; however, the property was eventually purchased by Transland Holdings, LLC ("Transland"),[2] which leased the property back to National. Coincidentally, Mr. Bromley and two other Defendants own interests in Transland. A similar transaction involved National's Memphis branch, where National passed on an option to purchase property valued at $775,000 for $325,000. Again, Transland purchased the underlying property and leased it back to National.

---

[2] The Court dismissed Plaintiffs' claims against Transland because the Court lacked personal jurisdiction over the company.

Furthermore, another of National's landlords, NST, of which Randall Bromley is the sole shareholder, has increased National's rent at several other branches beyond the consumer price index contrary to the leases, in one instance raising the rent by 33%. Additionally, National has made numerous loans to NST, which has carried a balance as high as $900,000.

### B. Unpaid Dividends

In 2003, National ceased paying dividends on preferred stock as a result of debt refinancing. As a condition of the refinancing, National agreed to refrain from paying distributions without lender approval. As provided in National's articles of incorporation, its preferred stock is the only class which is entitled to dividends. At the time of the refinancing, Plaintiffs were the only shareholders who owned preferred stock. Consequently, Plaintiffs were the only shareholders impacted by National's failure to pay dividends. Furthermore, Plaintiffs' allege that undisclosed dividends were paid to other shareholders, corporate books were misstated to hide misappropriation of corporate assets, and that Defendants denied Plaintiffs access to corporate records. Defendants deny these allegations and have presented evidence to the contrary.

### C. Ejection of Plaintiffs from National's Board of Directors

In April 2005, National's board consisted of seven directors, including Plaintiffs. After the lawsuit began, Randall Bromley, as majority shareholder caused the bylaws to be amended to decrease the number of directors from seven to four, thereby excluding Plaintiffs. One month after he removed Plaintiffs, Randall Bromley proposed that National's bylaws be amended. One of the proposed amendments increased the number of directors from four back to seven. As majority shareholder, Randall Bromley approved these bylaws in December 2005, and caused the board of directors to do the same. As a result, Randall Bromley, as majority shareholder was then able to elect

three directors of his choice to replace Plaintiffs on the board.

### D.  Amended Bylaws

National's bylaws were first adopted in 1989 ("1989 bylaws") and had not been amended since. According to minutes at the director's meeting held on May 15, 2005, the amendments were necessary to conform to the Michigan Business Corporation Act ("the Act"), and to address subjects not covered in the 1989 bylaws. Using the procedure discussed above, Randall Bromley amended National's bylaws.

The amended bylaws affected Plaintiffs in a number of ways. First, the amended bylaws changed the attendance policy for shareholder's meetings, requiring in-person attendance only and preventing Plaintiffs from participating via telephone. Second, the amended bylaws allow meetings to be adjourned without providing notice to persons not in attendance. Third, the amended bylaws allow National to notify its shareholders of upcoming meetings ten days before the scheduled date, which is also the same day shareholders must tender their proxies to the corporate secretary. Fourth, as stated above, the amended bylaws increased the number of directors from four to seven. Fifth, the amended bylaws provide that self-interested transactions by directors can be ratified by a vote of disinterested directors or shareholders. Sixth, the amended bylaws allow National to issue stock as payment for promises to provide services evidenced by a written contract. Seventh, the amended bylaws allow for National to issue promissory notes as dividends. Eighth, the amended bylaws allow National's directors to issue options and warrants for National's stock. Finally, the amended bylaws provide for the indemnification of parties affiliated with National in the event of litigation. These changes became effective on December 20, 2005.

### III. LEGAL STANDARD

Regarding preliminary injunctions, the Sixth Circuit has held that:

To determine whether to grant a preliminary injunction, a district court must consider:

    (1) the plaintiffs' likelihood of success on the merits;
    (2) whether the plaintiff may suffer irreparable harm absent the injunction;
    (3) whether granting the injunction will cause substantial harm to others; and
    (4) the impact of an injunction upon the public interest.

None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them.

*Abney v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006) (citations omitted). These four criteria simply guide the discretion of the court and are meant to serve as factors to be balanced, rather than rigid and unbending requirements to be met in every case. *See Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003); *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001). A stronger showing of likelihood of success is required as the other factors militate against granting relief, but less likelihood of success is required when they do support granting relief. *Performance Unlimited, Inc. v. Questar Publ'rs, Inc.*, 52 F.3d 1373, 1385-86 (6th Cir. 1995).

## IV. ANALYSIS

**A. Plaintiffs' Likelihood of Success on the Merits**

Plaintiffs' cause of action is based on several counts. The crux of Plantiffs' case is count I, alleging oppressive conduct by the majority shareholders under MICH. COMP. LAWS § 450.1489.

**1. Minority Opression**

The Michigan Business Corporation Act provides that:

(1) A shareholder may bring an action in the circuit court of the county in which the principal place of business or registered office of the corporation is located to establish that the acts of the directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder. If the shareholder establishes grounds for relief, the circuit court may

    make an order or grant relief as it considers appropriate, including, without limitation, an order providing for any of the following:

    (a) The dissolution and liquidation of the assets and business of the corporation.

    (b) The cancellation or alteration of a provision contained in the articles of incorporation, an amendment of the articles of incorporation, or the bylaws of the corporation.

    (c) The cancellation, alteration, or injunction against a resolution or other act of the corporation.

    (d) The direction or prohibition of an act of the corporation or of shareholders, directors, officers, or other persons party to the action.

    (e) The purchase at fair value of the shares of a shareholder, either by the corporation or by the officers, directors, or other shareholders responsible for the wrongful acts.

    \*\*\*\*

    (3) As used in this section, "willfully unfair and oppressive conduct" means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder. The term does not include conduct or actions that are permitted by an agreement, the articles of incorporation, the bylaws, or a consistently applied written corporate policy or procedure.

MICH. COMP. LAWS § 450.1489. [3]Accordingly, to succeed on this claim, Plaintiffs must demonstrate that Defendants' conduct was "illegal, fraudulent, or willfully unfair and oppressive" such that it interfered with Plaintiffs' rights as shareholders. *Id.* The Michigan court of appeals clarified the meaning of shareholder's rights, stating "[s]hareholder's rights are typically considered to include voting at shareholder's meetings, electing directors, adopting bylaws, amending charters, examining the corporate books, and receiving corporate dividends." *Franchino v. Franchino*, 263 Mich.App.

---

[3]Section 3 of the statute has been amended to include the sentence "Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other shareholder interests disproportionately as to the affected shareholder." MICH. COMP. LAWS § 450.1489(3).

172, 184 (2004).

Michigan courts have consistently held that the purpose of § 450.1489 is to protect minority shareholders, particularly in close corporations, from overreaching and heavy handed actions by the majority. *See Estes v. Idea Engineering & Fabrications*, 250 Mich.App. 270, 284 (2002) (citing an amicus brief filed by the Corporation Law Committee of the Business Law Section of the State Bar of Michigan). Furthermore, the provisions of the Act should be liberally construed to "give special recognition to the legitimate needs of close corporations." MICH. COMP. LAWS § 450.1103. When addressing such claims, the *focus is on the majority's conduct*, rather than the minority's expectations. *See Franchino*, 263 Mich.App. at 188 (emphasis added). Finally, "a shareholder who would be likely to prevail under this statute is one who presented an *ongoing pattern of oppressive misconduct*." *Estes*, 250 Mich.App. at 281 (emphasis added).

The court in *Estes*, adopting Judge Hoekstra's characterization of the relationship between shareholders in a close corporation, recognized a higher standard of fiduciary duties between majority and minority shareholders. *See Estes,* 250 Mich.App. at 281. Judge Hoekstra stated

> [T]he relationship among those in control of a closely held corporation requires a higher standard of fiduciary responsibility, a standard more akin to partnership law. The Legislature highlighted this special duty of care in the language of § 489(1) when it chose the words "illegal, fraudulent, or willfully unfair and oppressive" to describe the acts of the defendants.

*Id*. at 281 (internal citations omitted). Moreover, Michigan courts have historically held such shareholders to a higher degree of fiduciary duties, stating "[t]he law requires of the majority the utmost good faith in the control and management of the corporation as to the minority, and it is the essence of this trust that it must be so managed as to produce to each stockholder the best possible

9

return upon his investment." *Vesser v. Robisnon Hotel Co.*, 275 Mich. 133, 138 (1936).

This view is reasonable in light of the statutory directive to liberally construe the Act to better serve the unique needs of close corporations, and the distinct standard of care the majority owes to the minority provided for in § 450.1489. *See Estes*, 250 Mich.App. at 278.  Therefore, it is reasonable to conclude  that the type of conduct amounting to a breach of fiduciary duties in close corporations is the type of conduct prohibited by § 450.1489. Examples of such conduct include investments deemed not to be in the corporation's best interest, denying access to corporate books and records, diverting corporate opportunities and assets to other entities, removing minority shareholders from positions in management, refusing to declare dividends, and diluting minority equity interests. *See* 19 AM. JUR. 2d *Corporations* § 2372 (citing cases from numerous jurisdictions). *See also* 1 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS AND LLC MEMBERS § 3.11. It is also clear that conduct need not be illegal or fraudulent to be willfully unfair and oppressive under § 450.1489. *See Moore v. Carney*, 84 Mich.App. 399 (1978). Thus, actions that may be permissible under the Act may nevertheless constitute willfully unfair and oppressive acts towards the minority.

### 2. Oppression in the Present Case

The record in the case thus far reveals ample evidence of unfair and oppressive conduct.  In his position as majority shareholder, Randall Bromley has caused National to expend exorbitant amounts of money in transactions to which he had an interest. Further, Mr. Bromley has superficially ratified these deals as the majority shareholder. Most importantly, however, Mr. Bromley, making use of National's favorable governing documents, ejected Plaintiffs from National's board of directors and amended National's bylaws after this lawsuit began. The substance

of the bylaw amendments sheds light on the merit of Plaintiffs' claims. Particularly troubling are the amendments relating to attendance at shareholder meetings, proxy voting, ratification of conflicted transactions, and indemnification of corporate affiliates. While Defendants maintain that the amended bylaws simply track the provisions of the Michigan statute, this is not entirely correct, and the circumstances surrounding the amendments look suspiciously like a corporate freeze-out.

First, requiring in-person attendance at shareholder's meetings is legal and Defendants claim the change was made to protect corporate information. *See* MICH. COMP. LAWS § 450.1405. Likewise, the provisions allowing adjournments without providing notice is also legal. *See* MICH. COMP. LAWS § 450.1404. Further, Defendants maintain that the proxy provisions were added to provide guidance on proxy procedures since the 1989 bylaws did not contain like provisions. Yet in-person attendance at meetings requires Plaintiffs to travel from Michigan to Florida on ten days notice. Therefore, notice of a shareholder meeting could be given on the same day proxy notices would be due with the corporate secretary. Moreover, Defendants would not be required to give notice of adjourned meetings to those persons who did not attend in-person. When read together and in light of the timing and other circumstances of the case, the amendments give the appearance that Defendants are using their majority and control position to keep Plaintiffs out of corporate affairs. Individually, the amendments are legal, yet collectively they could be used oppressively. This substantially affects Plaintiffs' rights as shareholders.

Second, the amended bylaws make it possible for interested shareholders to ratify transactions where a director has a conflict of interest. While the language appears to be the same as the statute, the amended bylaw provision does not contain the full language of the statutory provision. The statute allows disinterested shareholders to ratify conflicted transactions. *See* MICH.

11

COMP. LAWS § 450.1545a(3). The statute provides that "a transaction is authorized, approved, or ratified if it receives the majority of votes cast by the holders of shares *who did not have an interest in the transaction.*" *Id.* (emphasis added). In contrast, the amended bylaws specifically allow interested shareholders to ratify conflicted transactions, stating that a conflicted transaction could be ratified if it is disclosed to "a majority of the shareholders *(irregardless [sic] of interest or disinterest)* entitled to vote and they authorize, approve or ratify such contract or transaction by majority vote or written consent ...." Restated Bylaws 2.11(b) (emphasis added). Thus, Randall Bromley, in his capacity as majority shareholder, could ratify transactions despite his interest. Accordingly, National's dealings with Randall Bromley, including his leased home and the leases with his other corporations, could be easily ratified by interested shareholders at the minority's expense.

Third, the amended bylaws would allow the corporation to indemnify affiliates of the corporation for losses incurred due to lawsuits. The bylaws' definition of affiliate appears tailored specifically to Defendants' other corporations: "An affiliate shall include ... any entity formed by officers, employees, Directors, or shareholders of the Corporation [National] to own assets leased to the Corporation [National]." Restated Bylaws 9.01. This provision goes beyond the statutory indemnification provision in that the statute does not allow indemnification for persons or entities who are not agents of National. *See* MICH. COMP. LAWS § 450.1561.

Finally, the amended bylaws increase the number of directors from four to seven. This amendment appears innocuous on its own, but in context it is disturbing. At one time, National had seven directors, three of whom are Plaintiffs in the current action. Following the commencement of this action, the bylaws were amended to decrease that number from seven to four, excluding

Plaintiffs. Now the bylaws have been amended again, according to Defendants to add three independent business people to the board. However, the timing of this change in management, combined with the other amendments to the bylaws, closely resembles tactics in a classic freeze-out attempt. Defendants have removed Plaintiffs from management positions, made it more difficult for them to exercise rights as shareholders, siphoned corporate assets to other organizations which they own, and hindered access to corporate books and information. After hearing the parties' arguments and reviewing their briefs and other documents, the Court concludes that Plaintiffs have demonstrated a strong likelihood of success on the merits.

**B.  Irreparable Harm to Plaintiffs Absent an Injunction**

Plaintiffs argue that they will be irreparably harmed if an injunction is not issued. Plaintiffs assert they will be harmed in that the amended bylaws make it possible for Defendants to hinder their voting rights, dilute Plaintiffs' equity interest in National and act without regard to their fiduciary duties while simultaneously indemnifying themselves for any asserted breach.

Defendants respond that Plaintiffs' claims of irreparable harm are purely speculative. Principally, Defendants argue that the amended bylaws were duly enacted and comply with the Michigan Business Corporation Act. Additionally, Defendants point out that if any harm was irreparable, Plaintiffs would not have waited more than six months after the effective date of the amended bylaws to seek injunctive relief.

A party's injury is considered irreparable if it is not fully compensable by money damages. *See Performance Unlimited, Inc.*, 52 F.3d at 1382; *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Mere injuries, no matter how substantial, in terms of money, time, and energy necessarily expended to comply with an injunction are not enough to show irreparable injury.

*See United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004). Likewise, a party's harm is not fully compensable if the nature of the loss would make damages difficult to calculate, as is the case with the loss of goodwill or breach of a covenant not to compete. *See Basicomputer Corp.*, 973 F.2d at 511-12. Conversely, "the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

A party seeking an injunction must demonstrate more than an unfounded fear of harm; rather, there must be a showing that the asserted harm is likely to occur. *See* 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (1995). While a party need not show that a harm is certain to occur, there must be a showing of a substantial threat of harm. *See id.*; *Michigan Coalition*, 945 F.2d at 153 (stating "the harm alleged must be both certain and immediate, rather than speculative or theoretical").

In this case, Plaintiffs have given numerous examples of how Defendants could act to harm them under the amended bylaws. Notably, Defendants' actions taken prior to amending the bylaws, specifically removing Plaintiffs from National's board of directors, have put Defendants in a position to oppress Plaintiffs and render their investments in National worthless. With no dissenting view on the board of directors, the amended bylaws would allow Defendants to severely dilute Plaintiffs' equity interest in National. Based on counsel's representations at oral argument, Defendants could issue stock, options, and warrants, at their discretion and to people of their choosing, leaving Plaintiffs' original investment a fraction of its original worth.

This harm cannot be easily calculated, nor could it be remedied. While it may be possible

to calculate the difference in value between Plaintiffs' equity now and some value in the future, the value of Plaintiffs' loss of control and input in the management of National, in which they invested substantial sums of money, cannot be appraised. Furthermore, if Defendants were to issue stocks or other equity interests, the Court would be required to cancel countless transactions with potentially innocent third parties and force them to sell back the equity in order to return Plaintiffs' to the status quo. This would present an undesirable and unmanageable task.

Defendants still argue that Plaintiffs' fears are speculative. The Court is not persuaded. Based on the record so far, there is ample evidence justifying Plaintiffs' concerns. Defendants also state that Plaintiffs admitted that no harm is likely while the case is pending before the Court. However, Defendants fail to see the significance of their own actions to date. While this case was pending, Defendants removed Plaintiffs from the board of directors in order to insert friendly members and amended National's bylaws. If Defendants were willing to take such action under the Court's supervision, it is not unlikely that they would be willing to take additional adverse actions against Plaintiffs. Consequently, Plaintiffs' fear is not unfounded or mere speculation; rather, it is concrete and an injunction is proper to prevent further harm to Plaintiffs until a trial on the merits.

## C. Burden on Defendants if Injunctive Relief is Granted

When deciding whether or not to issue an injunction, the Court must compare the burden on Plaintiffs if an injunction is not issued to the burden on Defendant if an injunction is issued. *See* 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.2. When this comparison is made, this factor favors Plaintiffs. Defendants have not presented any evidence to demonstrate that they will be significantly burdened if the Court issues an injunction.

Conceivably, Defendants' business could be harmed if its directors are not permitted to act

15

with the full authority provided by their bylaws. However, the Court fails to see how Defendants will be burdened by conducting business under bylaws they used for sixteen years. Defendants claim it will be burdensome for corporate officials to become reacquainted with the 1989 bylaws. This argument lacks merit. National's directors are sufficiently familiar with the 1989 bylaws, which they used until December 2005, and are fully capable of acting under those bylaws until trial in May 2007. Accordingly, the Court finds that Defendants will not be significantly burdened if an injunction is issued.

**D.  Impact of an Injunction upon the Public Interest**

The Court must also consider the impact an injunction may have on the public interest. By preventing Defendants from acting under the amended bylaws, the Court will ensure that directors and majority shareholders in close corporations abide by their fiduciary duties to the minority shareholders. On the other hand, the Court should ordinarily not interfere with corporate decision making. Thus, it could be argued that the Court should refrain from preliminarily enjoining corporate directors from acting under properly enacted bylaws. This result would facilitate corporate decision making and thereby promote business and economic interests.

Nevertheless, the balance of the public interest in this case weighs in favor of Plaintiffs. National is a close corporation and such corporations have received special treatment under Michigan law. Michigan's public policy discourages oppressive and unfair actions in close corporations, which may be accomplished by technically legal means. Furthermore, § 450.1489 specifically grants the Court authority to intervene in the inner workings of a corporation to remedy oppressive conduct. Based on the fact that the public interest favors enforcing fiduciary duties, and the fact that the Michigan legislature has acted with close corporations in mind, the public interest

weighs in favor of issuing an injunction.

**E.  Bond**

Plaintiffs contend that the Court should not require a bond in this case because they have demonstrated a strong likelihood of success on the merits. Defendants argue otherwise. Neither party has made a suggestion as to a bond amount. The Sixth Circuit allows the district court discretion on the issue of bond. *See Moltan Co. v. Eagle-Picher Industries*, 55 F.3d 1171, 1176 (6th Cir. 1995). In light of the Court's findings that Plaintiffs have a substantial likelihood of succeeding on the merits and that Defendants would not be significantly burdened by the injunction, the Court concludes that a bond is not necessary in this case.

## V.  CONCLUSION

After hearing the parties' arguments and weighing the traditional factors for granting or denying a preliminary injunction, the Court concludes that Plaintiffs are entitled to injunctive relief. The Court is satisfied that Plaintiffs have shown a strong likelihood of success on the merits and a sufficient threat of irreparable harm if an injunction is not issued. Finally, the Court finds that Defendants will not be substantially burdened if an injunction is issued and that the public interest will be served by enjoining further action under National's amended bylaws. Accordingly, Plaintiffs' Motion for a Preliminary Injunction is GRANTED. The Court HEREBY ORDERS that Defendants are hereby enjoined

(i) From requiring shareholders to appear in-person at annual or special shareholder's meeting pursuant to Sections 1.01 and 1.02 of the Restated Bylaws.

(ii) From adjourning annual or special shareholder's meetings without providing notice to those shareholders not in attendance under Section 1.05 of the Restated Bylaws.

(iii)   From requiring proxies to be tendered to the Corporate secretary no later than 10 days prior to any annual or special shareholder's meeting under Section 1.10 of the Restated Bylaws.

(iv)   From acting inconsistently with the duties of Directors as stated in MICH. COMP. LAWS § 450.1541 under Section 2.04 of the Restated Bylaws, including actions as a committee under Section 2.12 of the Restated Bylaws.

(v)   From authorizing, approving, or ratifying any contract or other transaction between the Corporation and one or more of its directors or any other corporation, firm, association or entity in which one or more of the directors are directors or officers or are financially interested under Section 2.11 of the Restated Bylaws. Furthermore, any such authorization, approval, or ratification shall be consistent with MICH. COMP. LAWS § 450.1545a.

(vi)   From causing National to issue additional shares of the common stock of National under Section 4.01 of the Restated Bylaws.

(vii)   From allowing the CEO of National to contract for the indebtedness of the Corporation separate from the Board of Directors under Section 5.02 of the Restated Bylaws.

(viii)   From causing National to issue promissory notes as dividends in lieu of cash under Section 7.01 of the Restated Bylaws.

(ix)   From causing National to issue rights, options and/or warrants for National's stock under Section 7.03 of the Restated Bylaws.

(x)   From causing National to provide indemnification for any party inconsistent with

    MICH. COMP. LAWS §§ 450.1561-65 under Section 9.01 of the Restated Bylaws.

This order shall remain in effect until May 31, 2007, or until further order of the Court.

**IT IS SO ORDERED**.

                s/Lawrence P. Zatkoff
                LAWRENCE P. ZATKOFF
                UNITED STATES DISTRICT JUDGE

Dated:  October 4, 2006

CERTIFICATE OF SERVICE

  The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on October 4, 2006.

                s/Marie E. Verlinde
                Case Manager
                (810) 984-3290